**HARRIS et al. v. WOOD COUNTY COTTON OIL CO. et al.**

No. 6447.

Court of Civil Appeals of Texas. Texarkana.

May 26, 1949.

Rehearing Denied June 23, 1949.

332

E. P. Bryan, Dallas, M. F. Cate, Terrell, for appellants.

Jones & Jones, Mineola, Dillard Baker, Houston, for appellees.

WILLIAMS, Justice.

W. B. Glenn and wife, both of whom died intestate in 1886, left an estate which consisted solely of four unimproved lots, of equal size and value, being lots 8, 9, 10 and 11, in Block No. 22, situated in the town of Hawkins, Texas. They left as their surviving heirs five children, one of whom was R. P. Glenn, a son. These children other than R. P. Glenn sold and conveyed in 1913, lots 8 and 9 to Holmes and Fowler. And in 1919, the children other than R. P. Glenn sold and conveyed to J. C. Ussery lots 10 and 11. Each deed was forthwith recorded in the Wood County deed records and purports to convey all the title to the respective lots in fee simple with general warranty of title.

In this trespass to try title action filed July 17, 1941, appellants, the heirs of R. P. Glenn, deceased, plaintiffs below, sought to recover an undivided one-fifth interest in above lots and the value of certain oils produced therefrom. Appellees consist of four groups of defendants below, to wit: (1) The heirs of Barney Holmes who claimed title to lots 8 and 9 under the ten and twenty-five year statutes of limitation; (2) the heirs of H. A. Kay, who claimed title to lot 10 and East half of No. 11, under the five and ten year statutes of limitation; (3) Wood County Cotton Oil Company Inc., who claimed title to West half of lot No. 11 under the five and ten year statutes of limitation; and (4) Humble Oil & Refining Company, the purchaser of the oil from wells produced on some of the lots. The oil and gas leasehold estates under which the oil was produced are not involved, the plaintiffs in their pleading having ratified and affirmed the leases. A take nothing judgment was entered against plaintiffs grounded on jury findings that sustained all limitation pleas urged by the defendants. Appellants concede the sufficiency of the evidence to support the Holmes claim to lots 8 and 9 under the ten and twenty-five year statutes of limitation.

In submitting the Kays' claim of title under the five and ten year statutes of limitation the court inquired in special issue No. 1 if the Kays in person or through tenants "have had and held peaceable and adverse possession of Lot 10 and East half of 11, cultivating, using or enjoying the same, or any part thereof, and paying all taxes thereon and claiming under a deed, or deeds, duly registered for any period of five consecutive years prior to July 17, 1941"; and in special issue No. 2 inquired if the Kays in person or through tenants "have had and held peaceable and adverse possession * * * or any part thereof,

for any period of ten consecutive years" prior to above date.

Frank Morrison who operated a general merchandise store across an alley and near above lots occupied a portion of the North end of lots 10 and East half of 11 during the period from 1919, the time the Kays acquired the property, until about the time this suit was filed. He occupied and used above area under an oral rental agreement from the Kays at a small rental payment per month. In the operation of his business, Morrison kept a 10 x 20 foot poultry house across the North end throughout the period; stored wagons, implements, brick and shingles that he sold from time to time through the years, and built and for a time maintained a small wooden platform for display of his implements. The Kays and Morrison did not limit the area rented by Morrison, and in the language of the latter, "I made a deal with her for the North part of Lot 10 and nearly half of 11"; "I could use all that I needed." The part that he did use through the years was in the north section of the property. As one witness described Morrison's use, "North part of them and probably went on down half-way the lots somewhere. He had wagons, plow tools, poultry, and such as that on them."

In August, 1935, the Kays in writing leased to John Smith 60 feet across the South end of above property on which he maintained a building for ten years under the lease in which a cafe was operated. This lease was recorded in the deed records, its date of recordation not being shown. North of the cafe building and south of that part used by Morrison there was a portion of lots 10 and East half of 11 that was vacant and used by the public without permission from any one for free parking of their vehicles when they came to trade. Appellants contend that Morrison used only ten feet and this when added to the sixty feet leased to Smith left a 45 x 45 foot area which they were entitled to recover. Under this theory appellants contend that the issues on limitation should have been limited to an inquiry on only the area occupied by Morrison and that rented to Smith.

The submission of the five year statute of limitation which authorized an affirmative jury finding to all of 10 and East half of 11 if the Kays in person or through tenants had used or enjoyed the same, or any part thereof, for any period of five consecutive years, as phrased in the issue, and the evidence in support of the affirmative finding are both sustained. We pretermit, as unnecessary, the companion complaint urged to special issue No. 2 and the affirmative finding thereon. The deed into Ussery out of the Glenns under its terms purported to convey to him the fee simple title to all of lots 10 and 11 with general warranty of title. The deed from Ussery to the Kays in 1919, purports to convey to the latter the fee simple title to all of lots 10 and East half of 11 with general warranty of title. Both deeds were forthwith filed and recorded in Wood County deed records. The Kays rendered for and paid taxes on lots 10 and East half of 11 for a period of five consecutive years before any delinquency. The Kays having asserted claim to this property during the period, having paid the taxes each year before delinquency, with the deed of record through the years that defined and gave notice of the extent of their claim, the occupancy and use of a part of the area by Morrison, their tenant, ripened a five year limitation title in the Kays to all of lots 10 and East half of 11. 2 Tex. Jur. Adverse Possession, Sec. 98; Houston Oil Co. of Texas v. William M. Rice Institute, Tex.Civ.App., 194 S.W. 413, 417; Roseborough v. Cook, 108 Tex. 364, 194 S.W. 131, 132; Holland v. Nance, 102 Tex. 177, 183, 114 S.W. 346, 348; 1 Am. Jur., Adverse Possession, Sec. 131. And in this conclusion it is unnecessary to look to the possession of that part of the area leased to Smith or to ascertain the exact extent of the area occupied and used by Morrison, the tenant of Kays, other than he did use and occupy substantial portions of the land for the required period of time. The rule applied in Simonds v. Stanolind Oil & Gas Co., 134 Tex. 332, 114 S.W.2d 226, urged by appellants, is not applicable to the limitation claim here asserted by the Kays.

Special issue No. 3 which submitted the five year statute of limitation claim of the Wood Cotton Oil Company to the West half of lot 11 inquired if the cotton oil company and those under whom it holds, either in person or through a tenant * * * had and held peaceable and adverse possession of lot 12 and the West half of 11, cultivating, using or enjoying the same, or any part thereof and paying all taxes thereon and claiming under a deed or deeds duly registered, for any period of five consecutive years prior to July 17, 1941; and special issue No. 4 inquired if the cotton oil company and those under whom it holds, either in person or through a tenant * * * have had and held peaceable and adverse possession of lot 12 and West half of lot 11, cultivating, using or enjoying the same, or any part thereof, for any period of ten consecutive years prior to above date.

Plaintiffs made no attack upon the title to lot No. 12. Title to this lot was never in plaintiffs. Up until 1941, and for twenty five years or more prior thereto, the owners erected and maintained a gin on lots 13, 14 and 15, and on lot 12 which lay to the east of lot 13, they maintained a seed house and platform scales in the operation of the gin and otherwise used lot 12 as a means of ingress and egress to and from the gin.

No type of improvements has ever been placed upon the West half of lot 11 by any one. The recorded original town plat of Hawkins, as therein shown, provides for an alley, running north and south across the North half of Block No. 22. The South half of the block makes no such provision. Until recent years the public highway ran along the north side of the block. Through the years customers coming from the north have traveled south down the designated alley in the North half of the block and into and upon the West half of lot 11 to reach the gin in their ginning transactions. The customers also used this West half of lot 11 and any adjacent vacant area for parking while awaiting their turn at the gin. The public at large during the years has used the vacant area for parking purposes. Until the discovery of oil in 1940, Hawkins with a population of 150 to 175 contained four or five stores and plenty of vacant lots in the area.

■ It is under above circumstances that the owners of the gin made use of this West half of Lot No. 11 in their operations of the gin. Such use by the owners of the gin is not of that degree as a matter of law as would constitute that "actual and visible appropriation of the land," as required under the provisions of art. 5515, R.C.S., which reads: "'Adverse possession' is an actual and visible appropriation of the land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another.".

Constructive possession of the West half of lot No. 11 did not rest for any statutory limitation period in any record owner of lots 12, 13, 14 and 15, or of any of them, grounded on such owner's use and occupancy, as herein detailed.

■ The record title to the West half of lot 11 rested in Ussery from May, 1919, until December, 1925, when he sold to R. Bergfield. He used lot 12 during this period under a deed out of Kay. He held record title under separate deeds. The Kay title was entirely foreign to the title out of the Glenns. The record title to lot 12 and West half of 11 rested in Bergfield or his heirs under a deed out of Ussery executed and recorded in 1925, until November, 1940, approximately fifteen years, when Bergfield heirs conveyed the same to the cotton oil company. Ussery in December, 1924, conveyed lots 13, 14, and 15, to R. Bergfield, who in April, 1925, conveyed last mentioned lots on which the gin was situated to Sikes. In March, 1935, Sikes in cancellation of certain purchase money notes conveyed the same to the cotton oil company, who the same year conveyed it to Mutual Gin Company, the present record title owner of lots 13, 14 and 15. The fact that R. Bergfield owned a major part of the stock in the cotton oil company, or that after his death one son became president of this company and another son became president of the Mutual Gin Company are immaterial here on the matter of constructive possession.

■ Applicable under above record title is the rule stated in Word v. Box, 66 Tex. 596, 3 S.W. pp 93, 98, discussed and applied under a similar record in Simonds v. Stanolind Oil & Gas Co., 134 Tex. 332, 114 S.W.2d pp. 226, 231, 232, which reads: "The rule is that the true owner of land, in the actual possession of a part, in law is deemed to be in the possession of the entire tract so owned, unless some other person be in the actual adverse possession of a part; but it has never been held that one who has an actual possession of land which he owns will be deemed in law to be in possession of land which he does not own from the simple fact that he may claim under a deed which purports to convey land to him to which he gets no title, as well as land to which he truly acquires title, even though the tracts purporting to be conveyed be contiguous to that to which title passes."

■ In the event they are denied a recovery of their one-fifth interest in each of lots 8, 9, 10 and East half of 11, by reason of above discussed limitation claims, and premised upon the facts that each of the four lots were equal in size and value, with title emanating out of W. B. Glenn and wife, the common source of title, plaintiffs assert that they are entitled to recover the whole of the West half of lot 11. This contention is sustained. The equitable doctrine invoked by plaintiffs and applicable to this record is summarized in Larrison v. Walker, Tex.Civ.App., 149 S.W.2d 172, 173, 177, w/r, to wit: "Under the well-settled doctrine of equitable partition the court in adjusting the equities of all the interested parties will protect such purchasers by setting aside to them the particular tracts purchased, if it can be done without injury to the other owners, where, as here, the acreage of the common property is of equal and uniform value; and will set aside to the nonjoining cotenants the equivalent of their interest in all the land out of the unsold tract if it is sufficient to satisfy same; and if the unsold tract is not sufficient to fully satisfy the interest of the nonjoining cotenants, then the remainder of their interest will be satisfied out of that sold, in the inverse order of the execution of such deeds." See also Pomeroy's Equity Jurisprudence, 4th Ed., Sec. 1224.

The cotton oil company in January, 1941, executed and delivered to Earl Hollandsworth an oil lease for a ten year primary term and therein described the land so leased as being "all of lot 12 and West half of No. 11, in Block 22, Hawkins, Texas, townsite." In addition to the usual ⅛ royalty, the lease also provided for certain overriding royalty to be paid lessors out of production. The lease provides: "In case said lessor owns a less interest in above described land than the entire and undivided fee simple estate therein, then the bonus, royalties and rentals herein provided for shall be paid the lessor only in the proportion which his interest bears to the whole and undivided fee."

The spacing rule in force in the Hawkins field at the time above lease was executed and at all times since provided that "no well shall be drilled hereafter for oil and gas * * * nearer than 933 feet to any other completed or drilling well on the same or adjoining tract, and no well shall be drilled nearer than 466 feet from any property, lease or subdivision line; provided that, subject to the further provisions hereof, the commission, in order to prevent waste or to prevent the confiscation of property, will grant exceptions to permit drilling within shorter distances * * *" The permit to drill was granted under above exception, it so stating. In April, 1941, the Railroad Commission of Texas granted Hollandsworth under the exception to the general spacing rule a permit to drill a well on above leasehold, namely, "Well No. 1, Wood County Cotton Oil Company, 0.12 acre Brewer Survey, as shown by plat submitted, to be spaced 22.5 feet from East and West lines and 57.5 feet from North and South lines." The oil produced since July, 1941, under above leasehold and permit, located in the center of the area, wholly on lot 12 and only 7.5 feet west of W.B. line of 11, has been purchased by the Humble Oil & Refining Company.

■ Plaintiffs contend that the cotton oil company having included the West half of lot 11 with lot No. 12 in above lease,

that the lease by such act became as a matter of law an unitized lease; that the cotton oil company, the railroad commission in the permit so issued, and the lessee in his operations so treated both tracts as a single unit of land or unitized lease. Grounded upon the above position and the further claim that the cotton oil company, as co-tenant with plaintiffs in the West half of lot 11, having the legal power to lease and include the latter lot 'in the lease so as to bind plaintiffs, they claim they are entitled to recover ⅓ of the royalty produced from the alleged unitized lease, being in the ratio that the area of the West half of 11 bears to the two tracts described in the lease. There is strong probability of drainage of oil from the West half of lot 11, and much merit to the argument that to deny them the claimed pro rata of the oil would permit the cotton oil company to reap the benefits of its own wrong.

If, as we have hereinabove concluded, that plaintiffs are entitled to recover all the interest in the West half of lot 11, there is no legal authority to hold that it executed the lease as a co-tenant of plaintiffs. There is not an intimation in this record that it intended to act as the co-tenant or agent of any one. Damages for the alleged mistake or wrong is not here being litigated.

Parker v. Parker, Tex.Civ.App., 144 S. W.2d 303, w/r, and French v. George, Tex. Civ.App., 159 S.W.2d 566, cited by plaintiffs, are not controlling here, for those cases deal with the intent of the several lessors who have joined in one lease. Japhet v. McRae, 276 S.W. 669, by the Commission of Appeals, and Mueller v. Sutherland, Tex.Civ.App., 179 S.W.2d 801, W.R.W.M., relied upon by appellees are not in point for we are not dealing here with the rights of a vendee of a part of the land in severalty then subject to a lease. It is without controversy that the cotton oil company executed the lease in good faith believing it to be owner of the whole of the West half of lot 11. It did own lot No. 12. It is our opinion that the cotton oil company intended the two lots to constitute one tract. If the cotton oil company did not in fact own the West half of 11, as we have hereinbefore concluded, it does not follow that the said company intended by its act to assign over to the owners of the West half of 11 one-third of the oil produced from the lot it did own. In the unitized leases discussed above and others that could be cited there is the controlling element of the intent of the several owners to pool their respective tracts in a common undertaking or joint venture. Such intent is not in evidence here. Plaintiffs did not join the cotton oil company as lessors. They are not named.

In addition to the reasons advanced in Japhet v. McRae, supra, 276 S.W. at page 671, contrary to the plaintiffs' position on drainage, it appears that plaintiffs possessed an equal right to protect drainage and obtain a permit to drill on West half of 11 that the Wood County Oil Company then possessed to obtain a permit to drill only on lot 12 under the above quoted exception to the general rule, namely, "in order to prevent waste or to prevent the confiscation of property."

The judgment of the lower court is reversed and here rendered to the extent that plaintiffs recover title and possession to the West half of lot No. 11 and the judgment in all other respects is affirmed.

Reversed and rendered in part and affirmed in part.