**LOEFFLER v. KING et al.**

No. 15100.

Court of Civil Appeals of Texas.
Fort Worth.

Feb. 10, 1950.

Rehearing Denied March 17, 1950.

Geo. E. B. Peddy, and Wm. N. Bonner, both of Houston, attorneys for appellant.

Kenneth Johnson and Guy Rogers, both of Wichita Falls, attorneys for appellees, Roy H. King, Al Horwitz, Sarah T. Horwitz, individually and as trustee of the Gloria T. Horwitz Trust, W. P. Oldom, Alpha Cottom, J. H. Cottom, Lacy Armour, and Laurance Armour.

Cantey, Hanger, Johnson, Scarborough & Gooch, all of Fort Worth, attorneys for appellees, The First National Bank of Chicago, Ill., Hugo A. Anderson, Trustee for The First National Bank of Chicago.

Smead & Harbour and H. P. Smead, all of Longview, attorneys for appellees, Paul B. Scott, Nate J. Ginsberg, Hyman Ginsberg, H. A. Fleishman, H. M. Bell, Trustee for Citizens National Bank of Tyler, Texas, and Central Pipe Line Company.

Frank Bunting; Stine & Stine and Vincent Stine, all of Henrietta, attorneys for appellees, Lilyan Chilson and Mary Atkeison et vir.

HALL, Justice.

Appellant Lee E. Loeffler instituted this suit in a district court of Wichita County, Texas against his co-tenants, their lessees, mortgagees and purchasing agencies, seeking an accounting and to establish his title to an undivided one-sixth mineral fee interest in the northeast portion of a tract of land out of J. P. Meade Subdivision of Block 2 of Margarette Ramsey Survey, situated in said County, and hereinafter more fully described. The case was presented to the court and judgment rendered against appellant; hence, perfection of his appeal consisting of four points.

Before considering appellant's points we deem it necessary to state the following facts:

In 1930, H. H. Haggard owned a fee simple title in and to a one-sixth interest in the hereinafter described land, and on March 21, 1930, he made a conveyance to appellant Loeffler and one W. H. Rankin, containing the following provisions, which are under attack in this case:

"That I, H. H. Haggard, of the County of Wichita, State of Texas, has and by these presents does grant, bargain, sell, convey, set over and assign and deliver unto W. H. Rankin & Lee E. Loeffler the following to-wit: ⅛th of the ⅛th Royalty interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described lands situated in Wichita County, Texas, to-wit: Being a part of Block No. Two (2) Meades Subdivision of the West one-half of the Margarette Ramsey Survey Abstract No. 471, and described as follows to-wit;—Beginning at the North-East Corner of said Block No. Two (2) said West half of the M. Ramsey Survey; Thence West along the North line of said Block 2012 Feet to the East line of the West 41 acres of said Block No. 2. Thence South along the east line of said 41 acres 1635 feet stake for corner, Thence East to the East line of said Block No. 2 and the West line of Block No. 3 M. Ramsey Survey, Thence North along said line 1635 feet to place of beginning, containing 80 acres more or less together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said lands for oil, gas and other minerals, and removing the same therefrom.

"And said above described lands being now under an oil and gas lease originally executed in favor of J. H. Cottom, E. 40 acres, and W. M. Scott, West 40 acres, and now held by Omohundro & Riner it is understood and agreed that this sale is made subject to said lease, but covers and includes ⅛th of all the oil royalty and gas rental or royalty due and to be paid under the terms of said lease.

"It is agreed and understood that ⅛th of the money rentals which may be paid to extend the term within which a well may be begun under the terms of said lease is to be paid to the said W. H. Rankin & Lee E. Loeffler, and in the event that the said above described lease for any reason becomes cancelled or forfeited, then and in that event, the lease interests and all future rentals on said land, for oil, gas and mineral privileges shall be owned jointly by W. H. Rankin & Lee E. Loeffler, Lilyan Chilson, Blanche Haggard and H. H. Haggard Guardian for William Howard Haggard, John Chilson Haggard and Nancy Catherine Haggard Minors, and each owning Record interest in all oil, gas and other minerals in and upon said land, together with ⅛th interest in all future rents. W. H. Rankin & Loeffler owning a ⅛th interest jointly."

The trial court construed the above portion of said deed from Haggard to Loeffler and Rankin as conveying a royalty interest as contended by appellees instead of conveying a mineral fee interest as contended by appellant (appellant having bought Rankin's interest in the property). The trial court cited for its authority in its conclusions of law the case of Kennedy v. Ellisor, Tex.Civ.App., 154 S.W.2d 284, writ ref. Said case was decided upon a question of limitation which is not involved here.

Appellant's first point is as follows:

"(A) The error of the Court in holding that the conveyance from H. H. Haggard to plaintiff Loeffler was, and after the expiration of the then existing lease, continued to be only a royalty interest.

"(B) The error of the Court in failing to hold that a conveyance of a ⅛th mineral interest in land, but subject to an existing, producing lease (⅛ of ⅛ royalty under the existing lease being also conveyed), did not ripen into a full ⅛th mineral interest upon abandonment and relinquishment of the lease."

While construing written conveyances presented to us by this appeal, we will consider the following well known rules of construction:

First: "Fundamental among these, are the rules that the deed should be construed against the grantor, rather than against the grantee, and that the intent of the parties must be sought. The intention which controls is not that which the parties may have had, but failed to express, but the intention which by the instrument they did express. The intent is to be gathered from the whole instrument. All parts of the deed must be considered and, unless conflicting, given effect. This is true even though the material part consists of different sentences and different paragraphs. But this rule of construction does not demand that every part of the deed shall be treated as of equal weight in the solution of every question that may arise. If a particular phrase in the deed is not in harmony with the remainder of the provisions, it should not have equal weight with the other terms used therein when it appears that the other terms have controlling effect in the instrument. Where there is a repugnance between a general and a particular description in the deed, the latter will generally control. The intent is to be arrived at without technical or mechanical rules of construction if such intent can be made to appear from the instrument. Technical rules are resorted to only when there is no other means." 31–A Tex.Jur., pp. 74–75.

Second: "Where the terms of the deed are plain and unambiguous, and in the absence of fraud, accident or mistake, parol evidence is inadmissible to vary them or to show the construction placed upon them by the parties at the time or subsequent to the making thereof." 31–A Tex.Jur., p. 76. See 58 C.J.S., Mines and Minerals, § 221b, p. 589, styled Construction in General.

With the above rules of construing deeds in mind, we find that the instrument is unambiguous and even though it mentions in the granting clause the words "royalty interest," yet after designating the owners of the then producing lease covering said interest in said land, said instrument grants to grantees money rentals which may be paid to extend the term of said lease. It also conveys to grantees, in the event said lease shall become forfeited or canceled, rights to all the lease interests and all future rentals on said land and all future interests in rents and all future interest in "all oil, gas and other minerals in and upon said land." This in our opinion would leave no interest in the minerals or in the royalty for grantor to own. He certainly did not reserve unto himself or except for himself any interest in and to said minerals. (It was agreed between the parties that H. H. Haggard only owned in fee simple a one-sixth interest in the land in question at the time he executed the written instrument to Loeffler and Rankin.) King v. First National Bank of Wichita Falls, 144 Tex. 583, 192 S.W.2d 260, 163 A. L.R. 1128; Clayton v. Ancell, 140 Tex. 441, 168 S.W.2d 230; Newman v. Kerlyn Oil Co., Tex.Civ.App., 189 S.W.2d 701; Porter v. Shaw, Tex.Civ.App., 12 S.W.2d 595; Olvey v. Jones, Tex.Civ.App., 95 S.W.2d 980, writ dismissed; 58 C.J.S., Mines and Minerals, § 221, p. 590; Watkins v. Slaughter, 144 Tex. 179, 189 S.W.2d 699; O'Fiel v. Brooks, Tex.Civ.App., 98 S.W.2d 266, writ refused.

Our holding under the above authorities is that the court erred in finding said instrument conveyed to appellant only a royalty interest. We find it conveyed to grantee the mineral rights owned by grantor, H. H. Haggard, subject only to the then existing producing oil and gas lease. For such reason appellant's point one is sustained.

Production on said lease ceased and on December 17, 1945, appellant and Rankin executed an oil and gas lease to one Horwitz for a primary term of three months. A portion of said oil and gas lease is quoted as follows: "If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, lessee shall have the period of sixty (60) days from the stopping of production within which, at his election, to commence operations for the drilling of another well, deepen an existing well or wells, or otherwise to attempt to restore the production of such existing well or wells, *and if such work is so commenced and prosecuted with reasonable diligence and production results therefrom,* this lease shall remain in force as long as production continues." (Emphasis ours).

Under (A) of appellant's second point he complains because the court erred in finding that his lease to Horwitz did not terminate at the end of said three months. This part of appellant's point two we overrule for the reason it is shown there was drilled on said lease two shallow wells which produced a small amount of oil in paying quantities for a short time.

Section (B) of appellant's second point is as follows:

"(B) The error of the Court in holding that plaintiff's lease to Horwitz did not terminate when, after the 3-months primary term, production wholly ceased for a period in excess of 60 days during which period lessees did not comply with the applicable saving provision in the lease * * *."

During the year 1946 there was produced on said lease by appellees the small sum of 409 barrels of oil; appellant and his partner, whom he later bought out, received royalty from said lease in a total sum of $15.58, in October, 1947. There was no production in November or December, 1946, or January, 1947; there was no production in June or July, 1947, and only six barrels were produced in August, 1947. There was produced during said year a total of 131 barrels. The defendants also reported to the Railroad Commission production from said lease in 1948 a total of twenty-two barrels, eight barrels in January, 1948 and fourteen barrels in June, 1948. The following is an itemized statement of the total quantity and dates of

production from said lease which certain appellees rely upon to sustain and extend the terms of the lease:

| Date | | Production Barrels |
|------|------|------|
| March, | 1946 | 12 |
| April, | " | 105 |
| May, | " | 106 |
| June, | " | 60 |
| July, | " | 66 |
| August, | " | 10 |
| September, | " | 29 |
| October, | " | 21 |
| November, | " | — |
| December, | " | — |
| Total | | 409 |

| Date | | Production Barrels |
|------|------|------|
| January, | 1947 | — |
| February, | " | 31 |
| March, | " | 6 |
| April, | " | 13 |
| May, | " | 15 |
| June, | " | — |
| July, | " | — |
| August, | " | 6 |
| September, | " | 15 |
| October, | " | 25 |
| November, | " | 8 |
| December, | " | 12 |
| Total | | 131 |
| January, | 1948 | 8 |
| February, | " | — |
| March, | " | — |
| April, | " | — |
| May, | " | — |
| June, | " | 14 |
| July, | " | — |
| Total | | 22 |

We sustain section (B) of appellant's second point by holding that the court erred in finding the three months primary term lease executed by appellant to one Horwitz did not lapse by failure to produce in paying quantities. The facts relate that these shallow wells were drilled to a depth of approximately 700 feet; they were drilled between old wells which had been abandoned but prior thereto had been producing oil for a number of years at the same depth. Appellee Roy King owned these two wells up until October, 1948; prior thereto he had sold his deep oil rights to Armour Properties.

The record shows this land was in a trend toward deep production not too far away. The deep well was drilled by Armour in July, 1948. Record of the total oil production valuation from the two shallow wells for a period of approximately two and one-half years was the sum of $1,025.55. It was admitted by Roy H. King that he spent the sum of $600 at one time in operating these two wells; his testimony on this point is as follows:

"I did not have the same experience with my other surrounding shallow wells that I had with these two on the Loeffler lease. I have spent $600 in one operation on one of these wells. I did not have the same water trouble with my other surrounding wells that I had here on this lease the reason being this (Loeffler lease) had been milked and it had been abandoned and naturally, the water level—the water drifted in, it would give us a great deal of trouble, more than something that was higher on the same structure. My other leases around there were producing from other levels which helped me to carry the Chilson lease along. We were not treating it (Chilson-Loeffler) as a lease; I was treating it as a block * * *."

Appellee King and other interested appellees contend the lease was kept alive because they were working on the wells at different intervals when they were not producing oil. Appellant contends the wells had never produced in paying quantities and therefore the three-month term lease was never extended but that if said lease did produce in paying quantities for a few months it then terminated because of nonproduction and a period of ninety days having elapsed without any effort or labor having been performed on said lease which efforts created production in paying quantities. This last contention of

appellant is supported by the evidence. Appellee Roy H. King testified he did not know why there was no oil production in November and December, 1946, and January, 1947. His son testified that no production in those months was caused by cold weather, that they did not have their equipment housed to keep same from freezing. In our opinion the lease lapsed for lack of production, and when a lease terminates by its own terms the parties cannot restore life to it. 31-A Tex.Jur., p. 288. The equitable rule as to relieving against forfeitures is not applicable in such case. Ibid., p. 289. Gillespie v. Bobo, 5 Cir., 1921, 271 F. 641. It is apparent from the testimony of lessee King and from the surrounding circumstances pertaining to the lease that he was trying to hold on to this lease for speculation purposes, trusting that the deep oil production might become closer in order that he could make a lease for a deep well which would become profitable to him, and as stated by our Supreme Court in the case of Garcia v. King, 139 Tex. 578, 164 S.W.2d 509, at page 513, "The lessors should not be required to suffer a continuation of the lease after the expiration of the primary period merely for speculation purposes on the part of the lessees. Since the lease was no longer yielding a profit to the lessees at the termination of the primary period, the object sought to be accomplished by the continuation thereof had ceased, and the lease had terminated."

Appellee Roy H. King contends that appellant had waived termination of the lease by accepting the above royalty check. In this connection it is noted there was sent to appellant another small check in the sum of $3.11, which was rejected by appellant. Appellee further contends appellant waived termination of the lease by allowing appellee Armour to drill the deep test well and in this connection it is noted in the brief of appellee King "the operator had never heard of or from Loeffler (appellant) during the 2½ year period." It is well to note here appellant Loeffler did not own the surface rights, that he had never seen the property which he had bought from Haggard and Rankin until after suit was filed, and he lived in Houston, Texas. As stated by our Supreme Court in the case of Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 137 A.L.R. 1032, which was a suit involving the same question of lapsation of an oil and gas lease after the expiration of the primary term because of failure to produce oil from the leased premises, "Lessee asserts that lessors by standing by and permitting lessee to produce oil from the premises from 1935 to 1937, and to otherwise develop and improve the lease at lessee's expense, thereby recognized the continued existence of the lease and are therefore estopped to plead the termination thereof. It appears, however, that the lease in question terminated by its own terms automatically upon cessation of production after the expiration of the primary term. The lease involved the conveyance of an interest in land, and any extension thereof would necessarily have to be in writing unless the doctrine of estoppel applies. 20 Tex.Jur. 272. The conduct of lessors, relied on by lessee as forming a basis for estoppel, all occurred after the lease had fully terminated. At that time lessee knew, or in law must have known, that his lease had terminated. In our opinion, lessors' mere silence after the expiration of the lease was not sufficient to recreate the lease. Guerra v. Chancellor, Tex.Civ.App., 103 S.W.2d 775, writ refused; 7 Tex.Law Rev. 8; 8 Tex. Law Rev. 530. Consequently, even though lessors did silently permit the improvement and development of the property after the termination of the lease, they are not now estopped to plead the termination thereof." See also Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339.

What we are holding, based upon the production record from this lease, is, the evidence is insufficient to support a judgment that the lease produced in paying quantities from July, 1946 to July, 1948, even though the trial court found that appellee worked on these wells from time to time. During said 730 days said lease produced 213 barrels, which is less than a third of a barrel of oil per day production,

and from the record as to expense of operation, it is clear that production was not in paying quantities during said two year period, even though after said date of July, 1948, it is shown that production was increased on account of the drilling of the deep oil well by Armour.

Appellee Armour Properties were charged with legal notice that the above lease had failed to produce and in all probability would never produce in paying quantities from the same level to which the two wells were drilled, to-wit, 700 feet, and evidently they had made some investigation and decided to take a chance on holding appellant's one-sixth interest in said land by reason of their assignment from King on this three-month primary lease. The following is noted in the record:

Early in August, 1948, Loeffler wrote The Texas Company, who had a contract to run the oil from this lease, as follows:

"D/O No 25-868-Wichita County

"Roy H. King Lilyan Chilson—80 acres "Gentlemen:

"With reference to the above property, my records indicate that last payment received covered runs for the month of October 1947.

"I would appreciate it very much if you would advise me the dates of runs since October 1947 or if you have any record of the well on this tract being abandoned."

On August 18, 1948, said Texas Company made the following reply to appellant Loeffler:

"We have your letter of August 11, wherein you advise that you have not received any proceeds on your mineral interest in that property covered by the subject lease subsequent to October, 1947.

"With respect to the above matter, we wish to advise you that there has been no oil run from the property in question to The Texas Company subsequent to October 1947, and this will account for your failure to receive any proceeds from this property during the period in question."

Along about the same time appellant had a conversation with R. E. Chambers, manager of Armour Properties, in Houston and advised Chambers he owned a one-sixth mineral interest in the northeast 80 acres of Block 2 because the King shallow wells had long since ceased to produce any oil, and on August 25, 1948 Chambers wrote appellant Loeffler the following:

"* * * I do not believe that you would have a chance to get a court in Wichita County to find that the lease covering your *1/16* interest in your 80 acres has been forfeited due to failure to produce. Although the report shows that very little oil has been produced from the shallow production I believe you will find that Mr. King will be able to prove that he has continued to squeeze and rework the wells from February until June of this year."

So we find appellee Armour recognizing that the re-working on the wells by appellee King was merely to try to squeeze some oil out of an old abandoned field having produced from the same level for a number of years in order to hold the lease. We have appellee King, from his testimony quoted supra, admitting that said lease "had been milked and it had been abandoned and naturally, the water level—the water drifted in, it would give us a great deal of trouble. * * * We were not treating it as a lease; I was treating it as a block." This testimony we interpret to mean that he was using these two wells to try to hold a block of acreage together rather than for production of oil in paying quantities from the lease in question.

We sustain section (B) of appellant's second point.

Section (B) of appellant's third point is as follows:

"(B) The error of the Court in holding that plaintiff Loeffler, by accepting a conveyance from W. H. Rankin, dated August 2, 1948, covering Rankin's 1/12th interest in the property, thereby 'ratified, adopted and confirmed the oil and gas lease executed by Rankin and Loeffler to Al Horwitz on December 17, 1945.' "

The trial court's conclusions of law in part are: "That Lee E. Loeffler, in accepting the deed from W. H. Rankin to Lee E. Loeffler, dated August 2, 1948, recorded in Volume 485 at page 15 of the Deed Records of Wichita County, Texas, ratified, adopted and confirmed the oil and gas lease executed by W. H. Rankin and Lee E. Loeffler to Al Horwitz on December 17, 1945. Grissom v. Anderson, 125 Tex. 26, 79 S.W.2d 619, also Greene v. White, 137 Tex. 361, 153 S.W.2d 575, 136 A.L.R. 626; Turner v. Hunt, 131 Tex. 492, 116 S.W.2d 688, 690, 117 A.L.R. 1066; and Leopard v. Stanolind Oil and Gas Co., Tex.Civ.App., 220 S.W.2d 259, 264. There being a flowing well on the property covered by said lease which continues to flow, such lease so ratified remains valid and subsisting."

As we have stated before, appellant Loeffler purchased from W. H. Rankin by deed dated August 2, 1948, a one-twelfth interest in the land under question, thus making appellant owner of the one-sixth interest formerly owned by Haggard and deeded to said Loeffler and Rankin, and it is by provisions of this deed from Rankin to Loeffler that appellees contend, and the trial court found, by his acceptance thereof, Loeffler adopted and confirmed the oil and gas lease executed by him and Rankin in 1945 to Horwitz. The portion of said written instrument under discussion is as follows: "It is distinctly understood and herein stipulated that said land is under an Oil and Gas Lease providing for a royalty of ⅛th of the oil and certain royalties or rentals for gas and other minerals, and that Grantee herein shall receive 1/12th of the royalties and rentals provided for in said lease; but he shall have 1/12th part of the annual rentals paid to keep said lease in force until drilling is begun." We note here that after the words, "It is distinctly understood and herein stipulated that said land is under an Oil and Gas Lease," there was struck out of said printed form which was used the following words: "made by Grantor." This, in our opinion, specifically demonstrates that appellant Loeffler was not recognizing the lease which he and Rankin had made as being in force but that he was strictly denying that said lease was in force by striking out the words, "made by Grantor"; and by the same token it can easily be assumed that Rankin did not want to execute a deed wherein there was an oil and gas lease on said property, to-wit, the one which Mrs. Chilson had executed on the other 5/6ths interest, without recognizing such lease in said instrument and making his deed subject thereto. She being a tenant in common with him, his grantee would naturally become interested in production from her lease. At any rate, the phrase "that said land is under an oil and gas lease" alone does not bring the case under the rule announced in the above four cases cited by the trial court in his conclusions of law, for in those cases the grantors recognized the particular leases made to particular parties and chose to make their conveyances subject thereto. In other words, if appellant's deed from Rankin had a provision similar to the following—said land is now under an oil and gas lease executed by the grantor and grantee to Horwitz on December 17, 1945, and this lease is made subject thereto—then in that event appellant would be estopped from now denying the validity of said lease after appellee Armour Properties had drilled a producing well, because by the recognition of such lease being in existence and in force appellant would be estopped under the cases cited by the trial court. However, no such stipulation is in said deed.

We find the evidence is insufficient to support the trial court's judgment that appellant, by accepting the conveyance from Rankin, ratified, adopted and confirmed the oil and gas lease executed by him and Rankin to Horwitz on December 17, 1945.

Section (B) of appellant's third point is sustained.

Appellant's fourth point is as follows:

"(A) The error of the Court in failing to award plaintiff a judgment for an undivided 1/6 interest in the minerals in a 67-acre tract of land in the Northeast 80 acres of Block 2, with a like interest in the

Armour wells Nos. 1 and 2, and an accounting against all the parties for the oil produced therefrom.

"(B) The error of the Court in failing to render plaintiff a judgment against all the defendants, particularly the defendants Scott, et al., Horwitz, et al., and Chilson, in a sum equal to 1/6 of 13/74.3 for the value of all the oil heretofore produced and hereafter to be produced from all of Block 2 South of the North 80 acres.

"(C) The error of the Court in denying the plaintiff Loeffler any recovery whatever against any of the parties defendant."

In discussing appellant's fourth point we will briefly enumerate owners of the title to Block 2, Meades Subdivision, supra, known as the Chilson land and covering the entire tract of land in question.

Appellees Alpha Cottom and J. H. Cottom, Al Horwitz and W. P. Oldom were jointly and equally interested in the two leases covering Block 2 of the Chilson land. Cottom assigned the Chilson lease, which was a ten year commercial lease, to Horwitz and Oldom, who in turn assigned the north part of the entire lease to Roy H. King and remainder of the tract to appellees Paul B. Scott et al., dba F. S. G. & G. Oil Co., reserving overriding royalties which were later distributed among Cottom, Al Horwitz, Sarah Horwitz, and W. P. Oldom. Roy H. King in turn assigned his interest in the deep rights to appellee Armour Properties, retaining an additional overriding royalty to himself. Later he assigned his entire lease, including the shallow rights, to Armour Properties.

Armour Properties had drilled three wells 330 feet north and Scott et al. had drilled four wells 330 feet south of the division line between the two tracts, leaving about 13 acres in the Scott et al. tract, of which appellant owned a 1/6th interest, which Scott et al. wells the court found to be within the following distances from the south line of appellant's land, along with other findings, as follows:

"That Paul Scott, Nate Ginsberg, H. A. Fleishman and Hyman Ginsberg, on that portion of the oil and gas lease above set out as being owned by them in Block Two (2) Meade subdivision of the Margarette Ramsey Survey, Abstract 471, Wichita County, Texas, drilled four (4) wells, located as follows:

"*Well No. 1:* 370.2' West of the East Line of the Loeffler 80 acre tract.

"*Well No. 2:* 17' South of the South Line of the Loeffler 80 acre tract.

"*Well No. 3:* 28.7' South of the South Line of the Loeffler 80 acre tract.

"*Well No. 4:* 105.6' South of the South Line of the Loeffler 80 acre tract.

"That neither Well No. 1, Well No. 2, Well No. 3, nor Well No. 4 that were drilled by the defendants, Paul Scott, Nate Ginsberg, H. A. Fleishman and Hymen Ginsberg, is located on any portion of the tract of land covered and affected by the deed from Haggard to Rankin and Loeffler.

"The court finds that Paul Scott, Nate Ginsberg, H. A. Fleishman and Hyman Ginsberg did no things or made no representations which in any sense defrauded plaintiff, Lee E. Loeffler.

"That the defendants, Paul Scott, Nate Ginsberg, H. A. Fleishman and Hyman Ginsberg did no things nor executed any instrument which would unitize, pool or otherwise join any of their property with any property belonging to plaintiff.

"That no oil was produced from the four (4) wells drilled by Paul Scott, Nate Ginsberg, H. A. Fleishman and Hyman Ginsberg from any part of the property covered in the deed from H. H. Haggard to Rankin and Loeffler."

For convenience we include here a rough sketch of plaintiff's Exhibit 38, which was prepared by a surveyor. Our sketch is not drawn to scale but does indicate the location of appellant's south boundary line (it being the dotted line C to D) relative to the wells drilled by appellees Scott et al., which appellant contends are unlawfully draining oil from his land. The tract of land in which Loeffler claims ⅙th of the minerals is indicated on said sketch by the lines drawn from points A to B, from B

to C, from C to D, and from D to A. The division line between what is referred to in this opinion as the Armour tract and the Scott tract is indicated by the broken line running east and west across the entire plat.

N.

W. — E.

S.

A.                                                                          B.

Shallow wells ⊘

Block 2 Sub. D West Half M. Ramsey Sur. 143.497 acres

984.3'

990.2'

991.4'

Armour Properties, 80 ac.

Loeffler 1/6 mineral

382' 1. ✕   661.9'   7 ●✕ 2.   651.8' - - - >   ● 3.

343'

267'

331.7' 1.   370.2'   287.8' D. ✕ 2.   13.93 acres   658.8'   > ● 3.   ● 4.   309.6'

17' 318'

28.7' 330.3'

105.6' 407.2'

C

F. S. G. & G. Oil Co
63.487 acres

Appellant contends the three Scott et al. wells, which are less than 330 feet from his south line, are unlawfully draining oil from his land; that Scott made an affidavit to the Railroad Commission in securing their four permits, which did not mention appellant or his land; that the Railroad Commission, no doubt, would have refused to grant said permits if Scott had disclosed true facts about appellant's ownership.

That said tract had been fully developed under the Railroad Commission rule prescribing 20-acre drilling units for the field. That the south side of the Scott et al. tract would probably produce no oil since there were two dry holes within 330 feet of their line, but by drilling on the north side of their tract 17 feet from the south line of appellant's tract, they were able to drill flowing wells with 60 barrels per day al-

lowable from each of the four wells and that most of said oil produced was unlawfully drained from appellant's land.

Appellant further alleged that Scott et al. had deliberately and recklessly invaded, destroyed and drained appellant's land, that appellant is entitled to recover actual and exemplary damages against Scott et al. and against all the appellees for the use of appellant's properties, wholly disregarding his rights with the result that appellant, the owner of a ⅛th interest in the land could never have but three wells drilled thereon. Appellant sued for the value of his oil unlawfully drained from his land and for further value of future drainage.

The trial court found as a matter of law pertaining to this subject the following:

"That the oil and gas lease from W. H. Rankin and Lee E. Loeffler to Al Horwitz, dated December 17, 1945, being in full force and effect, plaintiff, Lee E. Loeffler, owned no interest which would be involuntarily unitized or pooled with the leasehold estate owned by Paul Scott, Nate Ginsberg, H. A. Fleishman and Hyman Ginsberg.

"That the interest in the property in controversy held by Lee E. Loeffler being only a royalty interest, he held no interest subject to be involuntarily unitized or pooled with the leasehold estate held by Paul Scott, Nate Ginsberg, H. A. Fleishman and Hyman Ginsberg.

"That plaintiff is not entitled to recover against any party defendant by reason of his suit.

"Plaintiff has not sued for damages by reason of record facts as to all of the tract other than the North 80 acres thereof. He sues upon the theory that the drilling of a well on one tract of land, if too close to another, will automatically pool all interests and give to the man who owns all or an interest in adjoining lands a proportionate interest in the tract upon which the well is drilled. I do not understand such to be the Texas law. I understand the rule of law in Texas to follow the rule of capture. Hence, and wholly aside from questions of damage which are not before the court, it is my opinion that the interest of Loeffler is not pooled with the interest of

Scott in the wells drilled South of Loeffler's interest. [Harris v. Wood County Cotton Oil Co., Tex.Civ.App.], 222 S.W.2d 331. * * *"

■ We find the court erred in not hearing appellant's cause of action raised by his pleadings upon the merits and the law relative to recovering the value of his oil which had been unlawfully drained from his land, if any, by Paul Scott, Nate Ginsberg, H. A. Fleishman and Hyman Ginsberg from the three wells which are located less than 330 feet from his property line.

There was introduced in evidence by appellant an order issued by our State Railroad Commission adopting special rules and regulations applying to this particular field, to-wit, the Kempner Field, Wichita County, Texas, such order recites, among other things, the following:

"No well for oil or gas shall hereafter be drilled nearer than six hundred sixty (660) feet to any well completed in or drilling to the same horizon or reservoir and located on the same lease, tract, or farm; and no well shall be drilled nearer than three hundred thirty (330) feet to any lease line, property line, or subdivision line, provided that the Commission in order to prevent waste or to prevent the confiscation of property will grant exceptions to permit drilling within shorter distances than herein prescribed whenever the Commission shall have determined that such exceptions are necessary either to prevent waste or to prevent the confiscation of property. * * * No proration unit shall contain more than twenty (20) acres except as hereinafter provided. * * *"

In the case of Gulf Land Co. et al. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73, it was announced that the oil well spacing rule of the Railroad Commission was valid and that any one desiring to drill an oil well at a lesser distance than that specified by the spacing rule of the Railroad Commission must secure a special permit after notice and hearing, and such applicant must bear the burden of proving such well is necessary to prevent waste or to prevent confiscation of property.

It is stated in 31-A Tex.Jur., p. 670, sec. 400, that the spacing rules "apply to tracts

held by a single owner or by several owners. With a view to devising some reasonably definite plan or pattern to start with, the Commission promulgated Rule 37, which is one of the cardinal rules of the Commission, adopted after extensive hearings. * * * The rule's objective is conservation of natural resources. *It constitutes a limitation or restraint upon the unlimited right of capture.*" (Our emphasis).

It was held in Shell Oil Co. v. Railroad Commission, Tex.Civ.App., 133 S.W.2d 791, error dismissed, that the 330-660-foot spacing rule necessarily implied that a well would drain at least 330 feet.

In the case of Gulf Land Co. v. Atlantic Refining Co., 134 Tex. 59, 131 S.W.2d 73, it was held in substance that where the spacing rule for a particular tract is 150–330 feet, it means no well can be drilled at any point less than such space from any property or division line, or at any point less than the designated number of feet from any other well.

It was held in the case of F. A. Gillespie & Sons Co. v. Railroad Commission, Tex.Civ.App., 161 S.W.2d 159, error refused, that the spacing pattern prescribed by the Commission must govern and not a different one prescribed by the operators. Such rule of course must necessarily allow latitude in its application to meet specific factual situations, a mere slight departure should be construed to carry out rather than hinder a fair application of the rule. Humble Oil & Refining Co. v. Railroad Commission, Tex.Civ.App., 94 S.W.2d 1197, error refused; Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 99 A.L.R. 1107.

The Commission's spacing rule fixes the minimum distances at which wells may be drilled; if these three wells of the above named appellees, Scott et al., had been drilled 330 feet from the line of appellant, the only recourse for appellant, under the law of capture, would be to secure offset permits in order to stop the drainage from under his land, but since it is conceded by appellees and found by trier of the facts that their wells are a substantial distance less than 330 feet from appellant's land, then in that event appellant has a right to allege a cause of action to recover any oil he may have lost by such operation, without having to offset same, as his rights under the law are all the rights that are granted to an owner of real estate under the law of trespass to recover property which he has been unlawfully dispossessed and/or to recover the value thereof.

As pointed out in the case of Railroad Commission v. Magnolia Petroleum Co., Tex.Civ.App., 125 S.W.2d 398, 402, error refused, the Railroad Commission established the following portion of Rule 37, which may be pertinent to the question presented in this case: "'No well drilled in violation of this rule without special permit obtained in the manner prescribed in said rule, and no well drilled under such a special permit which does not conform in all respects to the terms of such permit, shall be permitted to produce either oil or gas; and any such well so drilled in violation of said rule or in violation of a permit granted as a special exception to said rule shall be plugged.'"

The trial court in his conclusions of law cited the case of Harris et al. v. Wood County Cotton Oil Co. et al., Tex.Civ.App., 222 S.W.2d 331, writ refused, n. r. e., as authority for denying appellant recovery. We do not deem the Harris case in point here for the following reasons: The Wood County Cotton Oil Co. received a *special permit* to drill on Lot 12 and a part of Lot 11; it developed that said Cotton Oil Co. did not own any part of Lot 11; the plaintiffs sued for a one-third interest in the oil runs on the ground said Cotton Company had included a part of Lot 11 with Lot 12 in securing its permit and as a matter of law it was entitled to be classified as an unitized lease. The court held there was no intention on the part of the Cotton Company to act in the capacity as co-tenant with the parties owning Lot 11. It was without controversy that the Cotton Oil Co. executed a lease in good faith believing it to be the owner of the west half of Lot 11. It did own Lot 12. But since the Cotton Oil Co. received a special legal permit to

drill on Lot 12, it appeared that the plaintiffs possessed an equal right to protect drainage by obtaining a permit to drill on the west half of Lot 11. This point of law we have heretofore discussed in this opinion. But such are not the facts in the case before us and we do not consider it in point here, for in the Cotton Company case the defendants possessed a legal right to drill sufficiently close to Lot 11 to drain it, even though they thought they owned a portion of Lot 11. The permits which appellees Scott et al. received from the Railroad Commission were not special permits to drill less than 330 feet from appellant's line, but their permits were under the spacing rule to drill no less than 330 feet from appellant's line; to allow appellees to ignore the spacing rule would of itself destroy such rule.

The trial court applied the stringent rule of capture in this case without applying its limitation, to-wit, "legitimate operation." The trial court was correct in so far as it went in stating the rule of capture, which is nothing more than a right the land owner has in all the oil and gas beneath his land or which is produced legitimately from wells on his land though some of the oil may have seeped from adjoining lands. The rule is fully discussed by our Supreme Court in the case of Elliff v. Texon Drilling Co., 146 Tex. 575, 210 S.W.2d 558, 562, 4 A.L.R.2d 191, but the court went on to say: "It must be conceded that under the law of capture there is no liability for reasonable and *legitimate* drainage from the common pool. The landowner is privileged to sink as many wells as he desires upon his tract of land and extract therefrom and appropriate all the oil and gas that he may produce, *so long as he operates within the spirit and purpose of conservation statutes and orders of the Railroad Commission.* These laws and regulations are designed to afford each owner a reasonable opportunity to produce his proportionate part of the oil and gas from the entire pool and to prevent operating practices injurious to the common reservoir. In this manner, if all operators exercise the same degree of skill and diligence, each owner will recover in most instances his fair share of the oil and gas.

This reasonable opportunity to produce his fair share of the oil and gas is the landowner's common law right under our theory of absolute ownership of the minerals in place. But from the very nature of this theory the right of each land holder is qualified, and is limited to *legitimate operations*. Each owner whose land overlies the basin has a like interest, and each must of necessity exercise his right with some regard to the rights of others. No owner should be permitted to carry on his operations in reckless or lawless irresponsibility, but must submit to such limitations as are necessary to enable each to get his own. Hague v. Wheeler, 157 Pa. 324, 27 A. 714, 717, 22 L.R.A. 141, 37 Am.St.Rep. 736." (Our emphasis.)

Neither party cited a case in point where a well was drilled on one tract of land but unquestionably drilled too close, and at a much less distance than that allowed by law to adjoining land, but we believe that the principles announced in Peterson v. Grayce Oil Co., Tex.Civ.App., 37 S.W.2d 367, are applicable to the problem before us. In the Peterson case a recovery was sought by the leaseholder against an adjoining leaseholder on the ground that the latter had wrongfully caused drainage of oil from the plaintiff's leased premises by the use of a vacuum pump in violation of Rule 40, adopted by the Railroad Commission. It was clearly held that the drainage of oil brought about by the unlawful use of the vacuum pump could serve as a basis for recovery of damages. The Court of Civil Appeals in the cited case reversed and remanded the cause on account of erroneous admission of evidence, and the Supreme Court, Grayce Oil Co. v. Peterson, 128 Tex. 550, 98 S.W.2d 781, affirmed the judgment of the Court of Civil Appeals on the ground of erroneous admission of evidence but declined to pass on the merits of the case for the reasons announced in its opinion. However, the holding of the Court of Civil Appeals appears to have been cited with approval by the Supreme Court in Elliff v. Texon Drilling Co., supra. It seems to us that a drainage of oil from plaintiff's premises, brought about by reason of the drilling of a well at a distance closer to plaintiff's land than

allowed by the Railroad Commission Rule, is wrongful to the same extent, and that damages are equally recoverable on account thereof, as in the case of a wrongful drainage by the use of a vacuum pump. The case just cited, as well as other cases cited therein, uphold the right of appellant to recover such damages as he may be able to establish.

We have carefully read appellant's section (B) in his fourth point and have come to the conclusion that the same does not raise an issue relative to the measure of damage and while we do not agree with appellant as to the measure of damage set out in his section (B), yet we do not have authority to pass upon the propriety of such measure of damage because the same is not before us. See Elliff v. Texon Drilling Co., supra. We have, however, enjoyed reading an interesting discussion as to the measure of damage outlined in 1 Summers, Oil and Gas, Perm.Ed. § 24, the Texas cases there cited on page 49, and in its pocket part supplement.

We do not find the question is before us as to the extent of appellant's cause of action, if any, alleged against appellees herein other than Scott et al., supra, because the pleadings may be amended upon another trial.

Judgment of the trial court is reversed and the cause remanded for a new trial not inconsistent with this opinion.